UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

BRIUNA HARPER,

    Plaintiff,

v.

TCC WIRELESS LLC and XYZ
INSURANCE COMPANY,

    Defendants.

Case No: 1:25-cv-00686-BBC

## REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION

In her response to TCC Wireless's Motion to Compel Arbitration (*see* D.E. 12; D.E. 13), Plaintiff admits (implicitly or otherwise) that: (1) numerous—valid—agreements to arbitrate between her and T-Mobile exist (D.E. 10-1 at 3–5 (stating that "Plaintiff entered into no less than four different agreements to arbitrate disputes with T-Mobile and its agents, dealers, or authorized retailers, of which TCC Wireless is one")), (2) she executed the various agreements to arbitrate with T-Mobile (*id.* at 2–5), (3) federal law and policy strongly favors arbitration (*id.* at 8–9), and (4) the claims Plaintiff alleges against TCC Wireless in her Complaint are covered by the broadly-worded agreements to arbitrate (*id.* at 6, 10–12). *See also Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (holding the plaintiff waived the right to challenge the defendant's position by failing to oppose defendant's argument in response brief).

The only argument Plaintiff offers in opposition to the Motion to Compel Arbitration is that the agreements to arbitrate "only compel[ ] arbitration in situations where the Plaintiff sues T-Mobile." (D.E. 12 at 1.) Plaintiff makes a related but ultimately unpersuasive argument that the agreement to arbitrate in T-Mobile's Terms and Conditions applies to "third-parties" when a

subscriber, like Plaintiff, asserts claims against T-Mobile *and* its "suppliers, dealers, authorized retailers, or third-party vendors." (D.E. 12 at 4) Plaintiff is wrong for the reasons discussed below.

Even assuming *arguendo* that TCC Wireless is not "party" (*i.e.*, a dealer, authorized retailer, etc.) to the various agreements to arbitrate she entered into with T-Mobile, Plaintiff is estopped from avoiding the broad and plainly applicable agreements to arbitrate. The Court should therefore hold that TCC Wireless may compel each of Plaintiff's claims to arbitration.

I. **Plaintiff misreads the plain language of the agreements to arbitrate she entered into with T-Mobile.**

As stated, Plaintiff does not dispute that she entered into various agreements, including agreements to arbitrate, with T-Mobile. Which is to say: Plaintiff is a party bound by the agreements to arbitrate "any and all" claims with T-Mobile. The only question, then, is whether the terms of those agreements exclude from arbitration Plaintiff's claims against TCC Wireless.

Plaintiff argues that T-Mobile's Terms and Conditions "provide for an argument for the inclusion of claims . . . such as T-Mobile 'suppliers, dealers, authorized retailers, or third-party vendors.'" (D.E. 12 at 4.) This is true: T-Mobile's Terms and Conditions state, in part, that the broad arbitration agreement set forth therein "includes any claims against other parties relating to Services, Products, or Devices provided or billed to you (such as our suppliers, dealers, authorized retailers, or third-party vendors) whenever you also assert claims against us in the same proceeding." (D.E. 10-3 at 5.) Identical language appears in the EIP Agreement. (*See* D.E. 10-7 at 3.) Yet Plaintiff misreads this plain language. To wit, she argues: "this inclusion [to arbitrate claims other than those alleged against T-Mobile] occurs only "whenever you also assert claims against 'us' in the same proceeding." [D.E. 10-3, p.2.] The Plaintiff has not asserted any claims against T-Mobile in her lawsuit."(D.E. 12 at 4.) Although her argument is not well developed, Plaintiff appears to

argue that because TCC Wireless obviously qualifies as a "supplier[ ], dealer[ ], authorize retailer[ ], or third-party vendor[ ]," the claims she asserts against it would be arbitrable *but for* the fact that she does not assert any claims against T-Mobile. Plaintiff, however, misreads the clearly stated arbitration language.

Instructive and dispositive is the court's decision in *Warciak v. Subway Restaurants, Inc.*, No. 16 CV 8694, 2017 WL 5895159 (N.D. Ill. Apr. 7, 2017) ("*Warciak I*"), *rev'd on other grounds*, 880 F.3d 870 (7th Cir. 2018) ("*Warciak II*").[1] There, the plaintiff sued Subway, alleging that he had received an unsolicited text message offering him a free sub "just for being w/ T-Mobile . . . ." 2017 WL 5895159 at *1. Warciak argued, in relevant part, that "the terms of the agreement exclude[d from arbitration] this dispute."[2] *Id.* at *4. But the *Warciak I* Court disagreed and examined the T-Mobile arbitration agreement, which is virtually identical to the ones that appear in T-Mobile's Terms and Conditions and EIP Agreement at issue in this case. *Compare id. with* (D.E. 10-3 at 5, D.E. 10-7 at 3).

Like Plaintiff here, Warciak argued "that the 'arbitration provision in T-Mobile's terms and conditions only applies to disputes with third parties' when claims are brought 'against [T-Mobile] in the same proceeding.'" *Warciak I*, 2017 WL 5895159 at *5. And whereas Plaintiff in this case sued only TCC Wireless, Warciak sued only Subway. *Id.* Critically, the *Warciak I* Court rejected the parallel arguments made by Plaintiff in this case and Warciak in his case:

Reading the agreement as a whole, instead of parsing it, [the plaintiff's] litigation

---

[1] On appeal, the Seventh Circuit held that the district court erred when it applied federal estoppel law, concluding that Illinois estoppel law should have applied instead. *See Warciak II*, 880 F.3d at 872–73.

[2] Unlike the instant case, where Plaintiff indisputably entered into various agreements to arbitrate with T-Mobile (*see* nn.1-2, *supra*), there was a dispute in *Warciak* as to whether the plaintiff had agreed to arbitrate any claims against T-Mobile. *See Warciak II*, 880 F.3d at 872.

> tactic does not save him from arbitration. The second sentence reads in its entirety: "This *includes* any claims against other parties relating to Services or Devices provided or billed to you (such as our suppliers, Dealers or third party vendors) whenever you also assert claims against [T-Mobile] in the same proceeding." "Includes" is not language of limitation, but rather of expansion, contemplating one scenario where the arbitration provision is applicable to disputes encompassing third parties. Indicative of this intent is the sweeping language of the first sentence: that "*any and all claims or disputes* in any way related to or concerning the agreement, our services, devices or products . . . will be resolved by binding arbitration." Here, too, the fourth line which notes "*including* billing disputes" does not narrow the otherwise extensive language of "any and all claim," but rather outlines a specific situation to which the far-reaching language is applicable.

*Warciak I*, 2017 WL 5895159 at *5.

In view of the foregoing, and in light of the plain language of the agreements to arbitrate in the Terms and Conditions and the IEP Agreement at issue in this case, Plaintiff has agreed to arbitrate "any claims against other parties relating to Services, Products, or Devices provided or billed to you (such as [T-Mobile's] suppliers, dealers, authorized retailers, or third-party vendors)." (D.E. 10-3 at 5, D.E. 10-7 at 3.) And *Warciak I*, interpreting arbitration language substantially similar to Plaintiff's agreements to arbitrate with T-Mobile, completely undermines Plaintiff's argument that her claims against "dealers" and third-parties—like TCC Wireless[3]—are only arbitrable when she also asserts claims against T-Mobile "in the same proceeding."

Accordingly, the Court can and should reject Plaintiff's argument that her claims against "dealers" and third-parties like TCC Wireless are arbitrable only when she asserts claims against T-Mobile "in the same proceeding" and it should otherwise grant TCC Wireless's Motion to Compel in its entirety.[4]

---

[3] *See also* Tarasievich Decl. ¶ 3. (D.E. 11-1 at 3.)
[4] To the extent the Court proceeds and analyzes the estoppel arguments presented below (although, for the reasons discussed herein, it need not do so), the Court might consider his contractual interpretation argument as part of its estoppel analysis.

## II. Additionally or alternatively, traditional principles of contract law allow a contract—including an agreement to arbitrate—to be enforced by a nonparty.

Assuming, *arguendo*, that Plaintiff's claims against TCC Wireless are not arbitrable based on the terms of the agreements to arbitrate Plaintiff indisputably entered into with T-Mobile, "'traditional principles' of state law allow a contract to be *enforced by* or against *nonparties to the contract*.'" *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (emphases added) (quoting 21 Williston on Contracts § 57:19 (4th ed. 2001)); *see also Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017) ("*Scheurer II*") (citing *Arthur Anderson* for same). The *Arthur Anderson* Court "stated its holding in terms directly applicable here: 'a litigant who was not a party to the relevant arbitration agreement may invoke § 3 [of the Federal Arbitration Act] if the relevant state contract law allows him to enforce the agreement." *Scheurer II*, 863 F.3d at 752 (quoting *Arthur Anderson*, 556 U.S. at 632). The parties agree that Supreme Court precedent "identifie[s] assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary, waiver, and estoppel among those state law principles that could govern who may enforce the agreement." *Id.* at 753 (citing *Arthur Anderson*, 556 U.S. at 631); *see also* D.E. 12 at 3 (citing *Arthur Anderson* for same). Notwithstanding the argument above, TCC Wireless will focus solely on the law of estoppel to enforce the various agreements to arbitrate Plaintiff signed with T-Mobile.

## III. What state law governs the state law/estoppel analysis?[5]

The T-Mobile Terms and Conditions contain a section entitled, "**WHAT LAW APPLIES TO THESE T&Cs?**" (D.E. 10-3 at 7.) In relevant part, that section states: "*This Agreement is governed by* the Federal Arbitration Act, applicable federal law, and *the laws of the state or jurisdiction*

---

[5] Plaintiff makes several references to the application of "state law" (*see* D.E. 12 at 2–3), but does not identify *which* state law governs (*see generally id.* at 1–6).

*in which your billing address in our records is located*, without regard to the conflicts of laws rules of that state or jurisdiction." (*Id.* (emphases added); *see also* D.E. 10-7 at 6 (EIP Agreement containing identical provision).)

There is no dispute that Plaintiff's "billing" address is a Texas address. (*See* D.E. 10-5 at 1; D.E. 10-7 at 1; *see also* D.E. 1, Compl., ¶ 1 ("Plaintiff . . . is an adult citizen and resident of the State of Texas, residing at 213 Table Dr., Waxahachie, Texas 75165.").) Accordingly, Texas law should govern the estoppel inquiry.[6] Nevertheless, the result is the same whether this Court applies Texas or Wisconsin (and/or federal) law: Plaintiff is estopped from denying the myriad arbitration provisions she entered into with T-Mobile and she must arbitrate her claims against TCC Wireless.

### A. Texas estoppel law

The Fifth Circuit Court of Appeals, which decides appeals taken from federal courts situated in Texas (*see* 28 U.S.C. § 41), has held that if the Texas Supreme Court were "faced with the question, [that state supreme court] would adopt intertwined claims estoppel[,]" which "involves compelling arbitration when a nonsignatory defendant has a 'close relationship' with one of the signatories and the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610-12 (5th Cir. 2016) (cleaned up); *see also Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 404 (5th Cir. 2022) (recognizing "that intertwined-claims estoppel exists in Texas"). "[I]ntertwined-claims estoppel applies when (1) a nonsignatory has a 'close relationship' with one of the signatories, and (2) the claims are intimately

---

[6] *See, e.g.*, *American Fam. Mut. Ins. Co. v. Cintas Corp., No. 2*, 914 N.W.2d 76, 82 (Wis. 2018) ("There is no doubt that, generally speaking, parties are free to choose the law governing their contracts."); Wis. Stat. § 401.301(1) (stating, in part, that "when a transaction bears a reasonable relation to this state and to another state or nation[,] the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties").

founded in and intertwined with the underlying contract obligations." *Id.* (quoting *Hayes*, 838 F.3d at 612) (internal quotations omitted). The elements of intertwined-claims estoppel are met under the facts of this case.

First, TCC Wireless has a "close relationship" with *both* signatories of the various agreements containing agreements to arbitrate. Among other things, "TCC Wireless is an authorized distributor of T-Mobile products and services, and operates retail stores selling cellular phones, accessories, and cellular phone plans, among things, for T-Mobile" (D.E. 11-1, Tarasievich Decl. ¶ 3.) To be certain, the operative Retail Services Agreement ("RSA") between T-Mobile and TCC Wireless sets forth, among other things, the parties' obligations vis-à-vis "Subscriber[s]" like Plaintiff and "Subscriber Information" (**Ex. 8**, RSA (excerpted and redacted);[7] **Ex. 9,** 2d Tarasievich Decl. ¶ 3). The RSA defines "T-Mobile Information" in relevant part as "[a]ny information about persons or entities that [TCC Wireless] obtains in any manner from any source under the [RSA], which concerns prospective and existing customers . . . of" T-Mobile, and "includes, without limitation, names, addresses, telephone numbers, . . . product and service usage information, . . . account information, . . . and any other personally identifiable information. T-Mobile Information is Confidential Information of T-Mobile." (*Id.* at § 1.40.)

"Confidential Information" under the RSA includes:

> all information not generally known to the public that relates to . . . Subscribers [and] potential Subscribers . . . [TCC Wireless] acknowledges that it may be given

---

[7] Under the RSA, "Subscriber" means "[c]ustomers, subscribers, or end users purchasing the Equipment and activating a new rate plan for Wireless Service through [TCC Wireless] or its Personnel . . . ." (Ex. 8 § 1.37.) "Subscriber Information" includes "[a]ny information gathered by or for [TCC Wireless] or its Personnel about an actual or potential Subscriber including, without limitation, names, addresses, e-mail addresses, telephone numbers, and all other personally identifying information, whether or not such information was gathered prior to the commencement of the [RSA]." (*Id.* § 1.38.) A complete, unredacted copy of the RSA is available for *in camera* inspection.

access to Confidential Information either orally or in written or other tangible form. All Confidential Information will be the sole and exclusive property of [T-Mobile], and [TCC Wireless] will not have any ownership interest in such information.

(*Id.* § 14.1.1).

Section 6.1 of the RSA is entitled, "Conditions of Employment of Provider Employees in the Locations," and states:

> [a]ll current [TCC Wireless] employees and new employees that [TCC Wireless] hires to staff Locations . . . operated by [TCC Wireless] (collectively, "Provider Employees") pursuant to this [RSA] must: (i) execute a Non-Disclosure Agreement governing access to confidential T-Mobile Information and Subscriber Information . . .; (ii) pass a criminal background check prior to permitting the Employee access to T-Mobile's Subscriber Information or accessing T-Mobile's POS Software . . .; and (iii) satisfactorily complete new hire training and ongoing training relation to promotion and sale of [T-Mobile's] Wireless Service and Equipment, and shall include . . . protection of Subscriber's Customer Proprietary Network Information ("CPNI") . . . . [TCC Wireless] shall monitor and strictly enforce [T-Mobile's] policies that all personnel have access to CPNI and other Personal Information of customers must strictly adhere to [T-Mobile's] policies and procedures regarding the protection of such information.

(*Id.* § 6.1; *see also id.* § 6.2.)

In other words, based on TCC Wireless's status as a T-Mobile authorized retailer/distributor pursuant to the RSA, TCC Wireless owes T-Mobile certain contractual duties as it relates to Subscriber Information, including T-Mobile Information and Confidential Information, as defined. But the closeness of the relationship between TCC Wireless and T-Mobile runs even deeper, including because under the RSA, TCC Wireless is authorized to "promote, market, and sell [T-Mobile's] Wireless Service and Equipment to actual and potential Subscribers," (Ex. 8 § 5.1), defined, respectively, as "[w]ireless communication service, including voice and/or data, or a combination of both" and as "[a]ny [T-Mobile] voice, data, or combined voice and data device, handset, telephone, or related equipment or accessors sold by [TCC Wireless] on behalf of [T-Mobile]

to a Subscriber," (*id.* §§ 1.41, 1.15). TCC Wireless also has the contractual authority to use T-Mobile marks and intellectual property. (*See generally id.* § 15 (redacted).)

Moreover, evidence of a "close relationship" exists for purposes of applying intertwined-claims estoppel when a plaintiff "treat[s] multiple defendants 'as a single unit' in their pleadings, 'raising virtually indistinguishable factual allegations' against them." *Id.* (quoting *Hayes*, 838 F.3d at 612–13). Although Plaintiff does not allege claims against T-Mobile, her Complaint is rife with no fewer than 23 "T-Mobile" references—and goes to great lengths to plead that T-Mobile and its "agents" (including, necessarily, TCC Wireless) failed to her safeguard private/personal information. (*E.g.*, D.E. 1 ¶¶ 1–4, 11, 13–17, 23–24, 26, 31–32, 38, 79.) For example, Plaintiff alleges, in part, the following:

- "T-Mobile is the third largest wireless carrier in the United States" and "has over 20,000 storefront locations," (*id.* ¶ 1);

- "T-Mobile and its agents fail to safeguard personal data of its customers and does not use customary practices or procedures to protect its customers' privacy and information," (*id.* ¶ 2);

- "For many years retail store employees have obtained sensitive information about T-Mobile customers," (*id.* ¶ 4);

- "Defendant TCC Wireless purportedly avails itself of the privileges of conducting activities in the state of Wisconsin including maintaining and operating one or more retail T-Mobile stores, selling phones and service plans and hiring and managing employees," (*id.* ¶ 11);

- "TCC Wireless is a licensee of T-Mobile and TCC Wireless's agents sell phone service plans and mobile phones to the public," (*id.* ¶ 15);

- "TCC Wireless offers for sale to the public T-Mobile phone service and mobile phones" and "TCC Wireless has T-Mobile stores in 24 states with over 200 stores," (*id.* ¶ 16);

- "TCC Wireless had knowledge that its employees and agents sell T-Mobile phone services and mobile phones to the public," (*id.* ¶ 17);

- "On or around 2015, Plaintiff was a T-Mobile customer with a contract for T-Mobile phone service," (*id.* ¶ 23; *see also id.* ¶ 24);

- "On November 9, 2024, Plaintiff drove [to, parked, and entered] the location of a T-Mobile retail store," (*id.* ¶ 26); and

- "T-Mobile and its partner stores represents to its customers, including [P]laintiff, that it has safeguards in place to protect consumer information"—and quotes from "T-Mobile's website" the safeguards/procedures "we have," (*id.* ¶ 32).

Plaintiff also makes various allegations that a rogue employee at a retail store operated by TCC Wireless engaged in criminal behavior resulting in the unauthorized disclosure of Plaintiff's private/personal information, (*id.* ¶¶ 29–30, 33–70), adding that "[t]he harm that befell [her] was foreseeable based on numerous and recent prior similar acts of data theft and privacy violations at T-Mobile stores," (*id.* ¶ 79).

To be clear, neither T-Mobile nor TCC Wireless is liable for the criminal misconduct of any TCC Wireless employee, and there is no basis in law or fact for T-Mobile to be named as a defendant in this action. In any event, for all intents and purposes, Plaintiff treats signatory T-Mobile and non-signatory TCC Wireless as a "single unit" in her pleadings. *See*, *e.g.*, *Hayes*, 838 F.3d at 612–13 (noting that the district court properly applied principles of estoppel to compel arbitration where the plaintiff treated signatory companies and non-signatory company as a "single unit" in his pleadings). Indeed, in paragraph 2 of her Complaint, Plaintiff refers to TCC Wireless as T-Mobile's "agent[ ]" when she avers that "T-Mobile and its agents fail to safeguard personal data of its customers and does not use customary practices or procedures to protect its customers' privacy and information." (D.E. 1, Compl., ¶ 2.) And in paragraph 32, Plaintiff alleges that "T-Mobile and its partner stores represent to its customers, including [P]laintiff, that it has safeguards in place to protect consumer information" and goes on to quote from T-Mobile's "website" and stating: "'We use administrative, technical, contractual, and physical safeguards designed to

protect your data.'" (*Id.* ¶ 32.)

All of this is to say that Plaintiff's allegations and claims relating to TCC Wireless's alleged violations of T-Mobile privacy "safeguards" are governed, in whole or in part, by the RSA, and that TCC Wireless's employee, Bradford, who ostensibly engaged in criminal conduct as to Plaintiff on or about November 9, 2024, (*see* D.E. 10-1 at 1 n.1), breached those safeguards, which provides Plaintiff with a basis to assert claims against TCC Wireless, which should be arbitrated. Such allegations and facts demonstrate not only satisfaction of the first element of the intertwined-claims estoppel analysis, *i.e.*, the 'close relationship,' but also that Plaintiff's claims are intimately founded in and intertwined with the underlying contract obligations. *Newman*, 23 F.4th at 404.

As discussed above, Plaintiff does *not* dispute that her claims are covered by the broadly-worded agreements to arbitrate. *Wojtas*, 477 F.3d at 926. Moreover, according to Plaintiff's own allegations, "T-Mobile and its partner stores," (*i.e.*, the TCC Wireless retail store identified in Plaintiff's Complaint (*e.g.*, D.E. 1, Compl., ¶¶ 26–70)), "represent to *its* customers, including [P]laintiff, that it has safeguards in place to protect consumer information" (*id.* ¶ 32 (emphasis added)). And, of course, each and every one of Plaintiff's claims alleged TCC Wireless touch and concern Plaintiff's (*i.e.*, Subscriber's) privacy/personal information disclosure concerns.

To be certain, in her *first* claim, alleging a violation of a federal statute, Plaintiff states, in part, that "Defendant, acting through their [sic] agent, Bedford, disclosed Plaintiff's personal intimate visual depictions." (*Id.* ¶ 72.) In her *second* claim (negligence), Plaintiff alleges, in part, that TCC Wireless "was aware that [its] licensee, employees, and agents, while conducting Defendant's business, access customer mobile phones," (*id.* ¶ 77), that "[t]he harm that befell Plaintiff was foreseeable based on numerous recent prior similar acts of data theft at T-Mobile stores," (*id.*

¶ 79), and that it was "reasonably foreseeable to Defendant . . . that its retail employees were routinely abusing their access to customers' private information during device upgrades and trade-ins," (*id.* ¶ 83). Likewise, in her *third* claim (negligent misrepresentation), Plaintiff pleads in part that "Defendant misrepresented to the public that person could bring their mobile phone to their store for purposes of an upgrade without personal, private information being put at risk," (*id.* ¶ 85), and that "[b]y making this misrepresentation, Defendant was required to exercise a duty of care for the Plaintiff, (*id.* ¶ 87).

In her *fourth* claim alleging a violation of a Wisconsin statute, Plaintiff avers that "Defendant . . . intruded upon the privacy of Plaintiff by accessing and carrying away her private, intimate visual depictions," (*id.* ¶ 90), Plaintiff's *fifth* claim (negligent hiring and retention) contains allegations that relating to the transfer of Plaintiff's private data, (*id.* ¶ 97). In her *sixth* claim (conversion), Plaintiff pleads, in part, that "Defendant . . . intentionally took control of Plaintiff's private, intimate representations" (*id.* ¶ 100). And in her *seventh* claim (statutory theft by fraud), Plaintiff states that "Defendant . . . took and carried away [her] property without her consent," (*id.* ¶ 104).

Of course, the T-Mobile Terms and Conditions require that "ANY AND ALL CLAIMS OR DISPUTES, OF ANY NATURE, *INCLUDING TORT AND STATUTORY CLAIMS*, IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, *THE PRIVACY NOTICE, PRIVACY OR DATA SECURITY PRACTICES*, OUR SERVICES, *DEVICES OR PRODUCTS* . . . WILL BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION . . . ." (D.E. 10-3 at 5 (emphasis added).) The EIP Agreement contains identical language. (D.E. 10-7 at 3.) Because each one of Plaintiff's seven alleged claims concern issues relating to the unauthorized disclosure of private/personal information stored on a mobile phone (*i.e.*, Equipment), Plaintiff's

claims absolutely are intimately founded in and intertwined with the underlying contract obligations (*see supra*). Thus, under Texas law, Plaintiff should be estopped from opposing TCC Wireless Motion to Compel Arbitration even though TCC Wireless is not itself a signatory to the agreements to arbitrate that exist between Plaintiff and T-Mobile.

### B. Wisconsin estoppel law

Should the Court determine that Wisconsin law governs the estoppel analysis, it must be noted that Wisconsin courts have had "little opportunity" to "apply contract and agency principles to the enforcement of agreements [to arbitrate] by or against nonsignatories." *Mayer v. Soil*, No. 2020AP199, 2021 WL 3073073, *6 (Wis. Ct. App. Jul. 21, 2021). In any event, the court in *Meyer* explained that "'a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are *intimately founded in and intertwined with the underlying contract* obligations.'" *Id.* at *7 (quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1129 (9th Cir. 2013)).

For the reasons explained above, the equitable estoppel analysis applied in *Mayer* is similar if not identical to the intertwined-claims estopped under Texas law as applied by the Fifth Circuit. To reiterate, Plaintiff's allegations and claims derive from TCC Wireless's "privacy" obligations as a T-Mobile "licensee" (D.E. 1, Compl., ¶¶ 14–15) and "authorized distributor of T-Mobile products and services, and operates retail stores selling cellular phones, accessories, and cellular phone plans, among things, for T-Mobile" (D.E. 11-1, Tarasievich Decl. ¶ 3); *cf. Mayer*, 2021 WL 3073073 at *12 ("there is a close connection between [the franchisor] and [its officer] . . . such that the [signatories to the franchise agreement] could have reasonably predicted the franchise agreement's extending to [a third-party]")).

In the event the Court does not apply *Mayer*, federal courts in Wisconsin have looked to

both federal and state law when considering whether to apply equitable estoppel in the context of a motion to compel arbitration. *Scheurer v. Fromm Family Foods, LLC*, 202 F. Supp. 3d 1040, 1043-44 (W.D. Wis. 2016) ("*Scheurer I*"). In *Hughes Masonry Co., Inc. v. Greater Clark Co. School Building Corp.*, 659 F.2d 836 (7th Cir. 1981),[8] the "[p]laintiff sued a defendant who was not a party to the contract itself but whose obligations were spelled out in the contract." *Scheurer II*, 863 F.3d at 754. In *Hughes Masonry*, the Seventh Circuit held that the nonsignatory-defendant could compel arbitration when a signatory's claims are grounded in or intertwined with claims under the agreement that subjects the signatory to arbitration. 659 F.2d at 38–39; *see id.* at 841 n.9 (stating, in part, that signatory-plaintiff "is estopped from denying [nonsignatory-defendant] the benefit of the arbitration clause with regard to that claims that are as intimately founded in and intertwined with the underlying obligations as [signatory's] claim appear to be here").

As set forth in detail above, Plaintiff's claims are intertwined with her own allegations and claims that T-Mobile and its "agent[ ]"/"licensee" failed to safeguard private/personal information, including pursuant to T-Mobile's policies. (*E.g.*, D.E. 1, Compl., ¶¶ 1–4, 11, 13–17, 23–24, 26, 31–32, 38, 79.) Thus, under both Wisconsin law (*Mayer*) and federal law (*Hughes Masonry*), Plaintiff should be estopped from denying the agreements to arbitrate Plaintiff entered into with T-Mobile.

And should the Court apply Wisconsin's general equitable estoppel law, those elements are: "(1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the

---

[8] TCC Wireless cites *Hughes Masonry* in the Memorandum in Support of its Motion to Compel Arbitration. (*See* D.E. 10-1 at 11.)

relying party's detriment." *Scheurer II*, 863 F.3d at 753 (quotations and citation omitted). TCC Wireless unequivocally relied on the agreements to arbitrate that Plaintiff entered into with TCC Wireless on October 27, 2023, (*see* D.E. 10-2 at 1-2), and on November 9, 2024, (*see* D.E. 10-4 at 1–2; D.E. 10-5 at 1; D.E. 10-7 at 1–7); Ex. 9, 2d Tarasievich Decl. ¶¶ 4–5)). TCC Wireless's reliance was reasonable because it "is an authorized distributor of T-Mobile products and services, and operates retail stores selling cellular phones, accessories, and cellular phone plans, among things, for T-Mobile." (D.E. 11-1, Tarasievich Decl. ¶ 3; *see also* Ex. 9, 2d Tarasievich Decl. ¶¶ 4–5.) Moreover, as discussed above, TCC Wireless has various contractual obligations relative to T-Mobile Subscribers and Subscriber Information, including Plaintiff's personal information (*see, e.g.*, Ex. 8, RSA § 6.1.2.). In contrast, in the *Scheurer* cases, "[n]othing in the record suggest[ed] that the [nonsignatory-defendant] relied on (or even knew of) the fact that [the plaintiff] had signed an agreement with an arbitration provision . . . ." *Scheurer I*, 202 F. Supp. 3d at 1044.

## IV. Conclusion

For the reasons set forth above and in TCC Wireless's Memorandum in Support, (D.E. 10-1), there is no dispute that Plaintiff agreed to arbitrate any and all claims against T-Mobile and its dealer/distributor third-parties, such as TCC Wireless. Additionally, or in the alternative, Plaintiff is estopped from disclaiming the agreements to arbitrate with T-Mobile. Therefore, the Court should grant TCC Wireless's motion and enter an order dismissing Plaintiff's Complaint or, alternatively, staying this matter and ordering the parties to arbitration.

Date: August 8, 2025

                                              Respectfully submitted,

                                              TCC WIRELESS LLC

/s/ Benjamin S. Morrell
Benjamin S. Morrell (IL ARDC No. 6341896)
Taft Stettinius & Hollister LLP
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Counsel for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I filed the foregoing documents with the Clerk of the Court using the Court's CM/ECF filing system, which will send notice of such filing to all counsel of record.

Dated: August 8, 2025

*/s/ Benjamin S. Morrell*
