# EXHIBIT 8

# RETAILER SERVICES AGREEMENT

This Retailer Services Agreement ("Agreement") is by and between T-Mobile USA, Inc. d/b/a T-Mobile, a Delaware corporation, and its subsidiaries and Affiliates ("Company"), and TCC Communications, Inc., an Illinois corporation, and its Affiliates and related entities ("Provider"). The effective date of this Agreement, upon being fully executed by both parties as described herein, shall be September 1, 2010 ("Effective Date").

## I.  RECITALS

1.  Company provides or is authorized to provide wireless communications service ("Wireless Service") directly to Subscribers in the Area defined in Exhibit B to this Agreement.

2.  Company desires that Provider own, staff and operate Locations in the Area, utilizing Company's experience, Confidential Information, Marks, and goodwill to promote and sell Company's Wireless Services and Equipment on behalf of Company to Subscribers under the terms and conditions of this Agreement and the Exhibits attached hereto.

NOW, THEREFORE, for good and valuable consideration the parties agree as follows:

## II.  AGREEMENT

1.  **DEFINITIONS.**  Certain capitalized terms used in this Agreement shall have the meanings specified below. Company may amend the definitions set forth herein and in the supplemental definitions section set forth in Exhibit D on thirty (30) days prior written notice to Provider:

   1.1  **Activation.**  The commencement of Wireless Services through Provider, on Company's behalf, to a valid Subscriber's SIM Card and assignment or Port-In of a wireless MSISDN or telephone number assigned to Company Equipment purchased by a bona fide Subscriber in accordance with the terms of this Agreement. Each new SIM Card assigned to a valid Subscriber's account under the terms of this Agreement constitutes an Activation; provided, however, that combined voice and data rate plans shall qualify as only one Activation. Features added onto an existing rate plan, or SIM Card, shall not qualify as an Activation as defined herein, but shall be considered a feature activation. Multiple pooled rate plans and shared rate plans (except Business Enterprise Plans) shall be compensated as stated in Exhibit C. Business Enterprises Plans will be compensated based on the number of SIM cards activated for Subscribers. Replacement SIM cards shall not be deemed an Activation.

   1.2  **Activation Date.**  The date on which Company commences Wireless Service to a valid Subscriber's SIM Card and assigns or Ports-In a wireless MSISDN or telephone number to Company Equipment purchased by a bona fide Subscriber in accordance with the terms of this Agreement.

   1.3  **Affiliate.**  Any corporation, person, partnership, limited liability company, or other business association (hereinafter "person") that directly or indirectly controls, is controlled by, or is under common control with another person or entity. Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting securities; or (ii) ownership of a majority of the beneficial interests in income and capital of an entity other than a corporation.

   1.4  **Anniversary Churn.**  Any Subscriber deactivation that occurs within one-hundred twenty (120) days following expiration of the Subscriber's Wireless Service Agreement Term.

   1.5  **Area.**  The market(s) set forth in Exhibit B, in which the Company provides Wireless Service and with respect to which the Provider shall own, staff and operate Locations, pursuant to this Agreement.

   1.6  **Billing Month.**  Each billing cycle, consisting of approximately thirty (30) days, used by Company to bill its Subscribers for Wireless Service.

**1.15** **Equipment.** Any Company voice, data, or combined voice and data device, handset, telephone, or related equipment or accessories sold by Provider on behalf of Company to a Subscriber to be used on Company's network, including SIM Cards.

**1.16** **Equipment Kit.** Equipment, as defined above (including SIM Card and accessories), packaged with one or more of the following: User Guide, Welcome Guide, Wireless Service Agreement, Terms and Conditions, rate plan information, or other Company collateral, Prepay Products, or "break-the-seal" shrink wrap.

**1.17** **GSM.** Global System for Mobile Communication.

**1.18** **Intellectual Property Rights.** All copyright, trademark, service mark, trade secret, patent, and other intellectual property rights (including all rights of registration or renewal thereof and all causes of action relating thereto).

**1.19** **Locations.** Provider stores approved by Company for Provider to own, staff and operate to promote, market and sell T-Mobile Wireless Service and Equipment pursuant to the terms of this Agreement.

**1.20** **Marks.** All service marks, trademarks and trade names sublicensed to Company, including, but not limited to, the mark **T-Mobile®**, by Company's parent corporation, Deutsche Telekom AG ("DT Marks"), and all service marks, trademarks and trade names owned by Company ("Company Marks").

**1.21** **Marks Rules.** The rules and procedures relating to Company's Marks as set forth in Exhibit E.

**1.22** **MSISDN.** Mobile Station International Subscriber Directory Number.

**1.23** **New Gross Subscribers.** The number of new Subscribers (i) that are submitted by Provider and accepted by Company; (ii) whose Activation Date occurred during the applicable commission period and whose Wireless Service was not Deactivated by the end of that commission period; and (iii) who have not previously subscribed to Company's Wireless Service within the last one hundred eighty (180) days. New Gross Subscribers shall not include Subscribers Activated on Prepay Products or Subscribers on excluded rate plans.

**1.24** **New Net Subscribers.** Calculated as follows: For each commission period, the number of New Gross Subscriber Activations less the number of previous Activations that became subject to Charge Backs during that commission period.

**1.25** **Personal Identification Number ("PIN").** The unique number issued by Company necessary to activate Company's Wireless Service with a Prepay Card or E-Coupon.

**1.26** **Personnel.** Provider's employees.

**1.27** **Port-In.** Activation of Wireless Service by Company to a valid Subscriber's SIM Card and assignment of such Subscriber's pre-existing MSISDN or telephone number, originally assigned by another telecommunications service provider, to Equipment purchased by a Subscriber in accordance with the terms of this Agreement.

**1.28** **Port-Out.** Deactivation of Wireless Service for any reason to the SIM Card, MSISDN, or telephone number assigned by Company upon a Subscriber's request to have their MSISDN or telephone number used in conjunction with another telecommunications service provider.

**1.29** **Prepay Activation.** The commencement of Wireless Service by Company to a valid Subscriber's Prepay SIM Card and assignment or Port-In of a wireless MSISDN or telephone number assigned to Company Equipment purchased by a bona fide Subscriber in accordance with the terms of this Agreement. Commencement of Wireless Service to the valid Subscriber's wireless MSISDN or telephone number must be accompanied by a minimum credit to Subscriber's prepay account of at least Fifteen and 00/100 Dollars ($15.00). Each new wireless MSISDN or telephone number assigned to a valid Subscriber's account, accompanied by a

minimum Fifteen and 00/100 ($15.00) credit to Subscriber's account, under the terms of this Agreement constitutes a Prepay Activation, except as otherwise provided herein.

**1.30** **Prepay Cards.** Prepay Products in the form of a plastic card or coupon.

**1.31** **Prepay Products.** Company's products (including, without limitation, Prepay Cards and E-Coupons) that permit Subscribers to purchase Wireless Service in advance for use over Company's wireless network by means of a unique PIN assigned to each product.

**1.32** **Renewal.** A Subscriber's entry into a new Wireless Service agreement, in conjunction with the purchase of new Equipment, as more particularly described below. A Subscriber will be considered to have renewed Wireless Service when the Subscriber: (i) purchases new Equipment through Provider on behalf of and as agent for Company for use of Wireless Service with such Subscriber's valid SIM Card (i.e., an equipment upgrade); (ii) enters into a new Wireless Service agreement with a term of not less than twenty-four (24) months; and (iii) is current in paying all amounts owed to Company (i.e., Subscribers whose accounts are not currently suspended or in collections). The Renewal may only be performed for such a Subscriber in accordance with Company's requirements relating to time of the Renewal relative to the Subscriber's current Wireless Service agreement term, and limitations on the number of Renewals permitted by Company for such Subscriber. Currently, Company requirements permit both Partial Renewals (Renewals occurring prior to the 11th month of Wireless Service on a one (1) year Service Agreement Term and prior to the 22nd month of service on a two (2) year Service Agreement term) and Renewals (occurring within the 11th month or later (1 year Service Agreement) or 22nd month or later (2 year Service Agreement). Features added onto an existing rate plan, or SIM Card, shall not qualify as Renewals. Notwithstanding any other provision herein, multiple pooled rate plans and shared rate plans shall constitute only one Renewal, irrespective of how many lines are renewed. Renewals shall only be performed via methods and procedures as authorized by Company.

**1.33** **Renewal Date.** The first day of a Subscriber's billing cycle following a Renewal.

**1.34** **SIM Card.** Any Subscriber Identity Module component supplied exclusively by the Company necessary for the operation of the Equipment on Company's Wireless Service.

**1.35** **Security Breach.** An actual, probable or reasonably suspected (i) breach of safeguards; or (ii) any other unauthorized acquisition, disclosure or use, or any loss, destruction or compromise of Company's Confidential Information.

**1.36** **Services.** Services provided by Provider and its Personnel within the Locations in the Area.

**1.37** **Subscriber.** Customers, subscribers, or end users purchasing the Equipment and activating a new rate plan for Wireless Service through the Provider or its Personnel in the Area. Each individual or business entity that (i) places a new order for Wireless Service through Provider or its Personnel that is accepted by Company, (ii) uses Company's Equipment to access the Wireless Service, and (iii) for which a SIM Card and the Wireless Service is Activated, is a Subscriber. For purposes of calculating Compensation owed to the Provider, where an individual or business entity places more than one order for Wireless Service and each order is assigned a different SIM Card, each order will be treated as a separate Subscriber if the order is accepted by Company and if the Wireless Service is activated on that order, subject to Company's Fraudulent Activities policy in Exhibit D; provided however that multiple pooled or shared rate plans shall constitute only one (1) Activation, except as specifically noted.

**1.38** **Subscriber Information.** Any information gathered by or for Provider or its Personnel about an actual or potential Subscriber including, without limitation, names, addresses, e-mail addresses, telephone numbers, and all other personally identifying information, whether or not such information was gathered prior to the commencement of the Agreement; Subscriber credit information; billing information; and call records. Subscriber Information is Confidential Information of Company.

1.39 **Terminal.** An electronic machine or other technology capable of producing E-Coupons approved by Company.

1.40 **T-Mobile Information.** Any information about persons or entities that Provider obtains in any manner from any source under the Agreement, which concerns prospective and existing customers or employees of (1) T-Mobile; (2) T-Mobile's affinity marketing partners; (3) T-Mobile's contracting parties; and (4) T-Mobile's data suppliers. T-Mobile Information includes, without limitation, names, addresses, telephone numbers, e-mail addresses, social security numbers, credit card numbers, call-detail information, purchase information, product and service usage information, frequent flier information, account information, credit information, demographic information and any other personally identifiable information. T-Mobile Information is Confidential Information of T-Mobile.

1.41 **Wireless Service.** Wireless communication service, including voice and/or data service, or a combination of both, provided by Company utilizing licensed and unlicensed wireless spectrum and accessed by digital wireless Equipment.

1.42 **Wireless Service Agreement.** The form of Agreement between Company and the Subscriber that contains the terms and conditions governing Company's provision and the Subscriber's use of the Wireless Service.

2. **EXHIBITS.** The following exhibits are by this reference incorporated into this Agreement: A (Provider Employee Requirements), including Schedule 1 (Non-Disclosure and Confidentiality Agreement)); B (Area); C (Retail Services Compensation), including Schedule 1 (FlexPay SPIFF Compensation, Terms and Conditions); D (T-Mobile Provider Program Rules), including Schedule 1 (Consumer Code for Wireless Service), Schedule 2 (Policies on Direct Sales Solicitations), and Schedule 3 (Operating Standards)); E (Mark Rules) and E1 (DT Trademark Guidelines); and F (Inventory Consignment Terms and Conditions). Company may amend any and all terms in Exhibits A, B, D, E and F, and any addenda thereto, on thirty (30) days prior written notice to Provider, unless stated otherwise in the Exhibit or addendum. Provider's continued marketing and sale of Company's Wireless Service and Equipment after the effective date of any amendment shall constitute Provider's acceptance of such amendment.

3. **INDEPENDENT INVESTIGATION.**



4. **APPOINTMENT, SCOPE AND RELATIONSHIP OF PARTIES.**

4.1 **Appointment of Provider.** Company hereby appoints Provider as an independent contractor to lease or own, staff and operate Locations to service Subscribers and Potential Subscribers located within the Area described in Exhibit B in accordance with the terms and conditions of this Agreement.

4.2 **Provider Exclusivity.**



4.3 **No Company Exclusivity.**

Provider's Initials _____

reasonable specifications; (ii) Company funds collected by Provider from Subscribers (iii) agreed upon reimbursements to Company for advances; or (iv) amounts related to and limited to deductions from Compensation owed to Provider by Company such as for Charge Backs for Deactivations or damages arising from Provider's material breach of this Agreement.

**4.8**    **Regulatory Matters**.  This Agreement shall at all times be subject to changes or modifications to comply with, or to obtain any necessary approvals of, local, state, and federal regulatory agencies and courts having jurisdiction over the provision of the Wireless Service in the Area.  Provider shall take no action inconsistent with, and agrees to support, any efforts by Company before regulatory authorities or others regarding regulatory issues to the extent such efforts or actions are undertaken by Company.

**4.9**    **No Other Agreements.**  Provider represents and warrants to Company that the execution and performance of this Agreement does not and will not violate any other contract or obligation to which Provider is a party, including terms relating to covenants not to compete and confidentiality covenants.  Provider will not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association, or entity.  Provider represents and warrants that it has returned all property and confidential information belonging to all other service providers for whom Provider may have acted, but is no longer acting, as a Provider.

**4.10**   **No Sub-Contracting**.  Provider shall not subcontract or otherwise delegate management or operation of the Locations or Provider's performance obligations hereunder without the prior written consent of T-Mobile, in its sole discretion.

**5.**     **MARKETING AND PROMOTION OF THE WIRELESS SERVICE AND EQUIPMENT.**

**5.1**    **Adherence to Good Business Practices**.  During the term of this Agreement, subject to the terms and conditions set forth herein, Provider shall use its best efforts to promote, market, and sell Company's Wireless Service and Equipment to actual and potential Subscribers.  Without limiting the generality of the foregoing, Provider shall:

    5.1.1    Identify itself as the owner and operator of all Locations in the Area, and with respect to all Locations, an independently owned and operated business.

    5.1.2    Conduct itself with the highest standards of honesty, integrity, and fair dealing and do nothing that would, in the opinion of Company, tend to discredit, dishonor, reflect adversely upon, or in any manner injure the reputation of Company, any other alternative distribution channel of Company's Wireless Service, or the employees of Company who provide ongoing support and service to Provider.

    5.1.3    Conform to the highest ethical standards for advertising and strictly comply with all Company advertising standards.  All advertising and promotional materials relating to the Locations in the Area shall be subject to the prior written approval of Company in every instance, in Company's sole discretion.

    5.1.4    Strictly comply with and ensure that its Personnel are adequately trained on Company's Operating Standards, Company's Program Rules (see Exhibit D), and all other standards, policies, and procedures governing the marketing, promotion, and sale of the Wireless Service, including standards, policies and procedures Company may communicate to Provider from time to time as Company may deem reasonably necessary to ensure high customer satisfaction levels, high quality in-person sales transactions, communication of adequate disclosures, and the integrity of all sales transactions conducted by Provider involving the Wireless Service.

    5.1.5    Ensure that each Subscriber has been fully and adequately informed about the Wireless Service, rate plan, features, and any Equipment being purchased.  Provider shall ensure that each Subscriber reviews and shall provide the Subscriber with ample time to review Company's Wireless Service agreement terms and conditions and any and all collateral

Provider's Initials _____

**5.4**   **Subscriber Complaints and Actions Involving Provider.**

5.4.1 █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

5.4.2 █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

5.4.3 █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

5.4.4 █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████



**5.5**   **Non-Discrimination.** ████████████████████████
████████████████████████████████████████████████
███████████████████████

**6.**   **QUALIFIED STAFFING, TRAINING, OPERATIONS STANDARDS, AND SERVICE LEVELS.**

**6.1**   **Conditions of Employment of Provider Employees in the Locations.** All current Provider employees and new employees that Provider hires to staff Locations leased, staffed and operated by Provider (collectively, "Provider Employees") pursuant to this Agreement must: (i) execute a Non-Disclosure Agreement governing access to confidential T-Mobile Information and Subscriber Information, the form of which is attached hereto as Schedule 1 to Exhibit A to this Agreement; (ii) pass a criminal background check prior to permitting the Employee access to T-Mobile's Subscriber Information or accessing T-Mobile's POS Software (specific conditions of such background check are set forth in Exhibit A to this Agreement); and (iii) satisfactorily complete new hire training and ongoing training relating to promotion and sale of Company's Wireless Service and Equipment, the content of which shall be specified by Company, and shall include instruction on Company's sales methods, policies and procedures, protection of Subscribers' Customer Proprietary Network Information ("CPNI") and access to Company's point of sale systems. Provider shall monitor and strictly enforce Company's policies that all personnel who have access to CPNI and other Personal Information of customers must strictly adhere to Company's policies and procedures regarding the protection of such information.

6.1.1 *Prohibited Personnel.* Provider shall ensure that no individual(s) or entities having access to T-Mobile Confidential Information are listed on (a) the Specially Designated Nationals and Blocked Persons list maintained by the U.S. Treasury, Office of Foreign Assets Control; (b) the Denied Persons or Denied Entities lists maintained by the U.S. Department of Commerce, Bureau of Industry and Security; (c) the Debarred Persons List maintained by the U.S. Department of State, Office of Defense Trade Controls;

(d) any successors to the foregoing; or (e) any similar lists maintained by any agency of the U.S. government.

6.1.2 <u>Provider Employee/Personnel Removal</u>. Provider shall, upon Company's reasonable, written request, promptly (and in no event more than twenty-four (24) hours after any such request) remove from directly providing the Services any person whom Company determines in its reasonable discretion to be unqualified or otherwise unsuitable to sell Company's Wireless Service or Equipment. Provider shall ensure that such person(s) is not able to access any T-Mobile Confidential Information and shall deactivate any Company-associated log-ins or other access controls for such person(s). By way of illustration, and not limitation, Company may reasonably deem personnel unqualified or unsuitable to directly service Company customers for demonstrated poor performance, conduct that violates any provision of this Agreement or complaints of inappropriate conduct with any Company Subscriber, customer or representative (e.g., abusive language or behavior, marked discourtesy or sexual innuendo or commentary). The rights and remedies of Company under this Section are in addition to, and not in lieu of, any other right or remedy afforded to Company under any other provision of this Agreement, by law or otherwise.

**6.2 <u>Responsibility for Training and Service Levels</u>.** Provider shall have sole responsibility for its Personnel who perform any services under the terms of this Agreement. Provider shall maintain a properly trained sales force of adequate size to effectively promote and sell the Wireless Service and Equipment on behalf of Company, and maintain the high standards for customer support and service required under this Agreement or as Company may otherwise communicate to Provider from time to time.

6.2.1 <u>Training</u>. Provider shall offer and ensure that its Personnel attend and/or successfully complete new hire and ongoing training covering information necessary to allow them to accurately and effectively promote and sell the Wireless Service and Equipment on behalf of Company in accordance with Provider's obligations under this Agreement. Company may, from time to time, also require Provider's Personnel to successfully complete mandatory training and certification programs, such as privacy and security, and other compliance training.

6.2.2 <u>Service Levels</u>. Provider shall, in connection with the promotion and sale of Company's Wireless Service and Equipment, maintain service levels as may be reasonably established by Company from time to time. Such service levels shall be measured based in part upon (i) Provider's and its Personnel's understanding of and ability to accurately communicate to Subscribers and potential Subscribers information about Company's Wireless Service and Equipment, including, without limitation, features, rate plans, promotions, and coverage; (ii) Provider's and its Personnel's understanding and adherence to Company's standards, policies, and procedures relating to the marketing, promotion, and sale of the Wireless Service, including, without limitation, the standards, policies, and procedures described in Exhibit D; and (iii) Provider's Personnel's overall focus on and efforts to maintain a high level of customer satisfaction during and after the sales process.

**6.3 <u>Use of Company Systems</u>.**

6.3.1 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

6.3.2 ████████████████████████████████████████████
███████████





13.1.1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13.1.2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13.2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## 14. CONFIDENTIAL INFORMATION, RECORDS, PRIVACY.

### 14.1 Confidential Information.

14.1.1 "Confidential Information" includes all information not generally known to the public that relates to the business, technology, Subscribers, potential Subscribers, finances, budgets, projections, proposals, operation, systems, policies, procedures, plans and practices of Company, including without limitation the terms of this Agreement, the identities of and all information regarding Subscribers and potential Subscribers, and all information relating to Company's business plans and proposals, marketing plans and proposals, technical plans and proposals, and research and development. Provider acknowledges it may be given access to Confidential Information either orally or in written or other tangible form. All Confidential Information will be the sole and exclusive property of Company, and Provider will not have any ownership interest in such information or engage in any derivative uses of such information. Provider agrees that during the Term of this Agreement and for five (5) years thereafter (and with respect to personally identifiable information and trade secrets, indefinitely), it shall (i) use at least the same degree of care to prevent unauthorized use and disclosure of such Confidential Information as that party uses with respect to its own confidential information (but in no event less than a reasonable degree of care); (ii) use such Confidential Information only in performance of its obligations under this Agreement; and (iii) not disclose or grant access to such Confidential Information to any third party, without the express prior written consent of the disclosing party. The terms and conditions of this Agreement shall be deemed Confidential Information of each party.

14.1.2 This Section will not apply to any information (i) previously known to Provider free of any obligation to keep it confidential; (ii) which becomes generally available to the public through no wrongful act; (iii) that is rightfully received from a third party under no obligation of confidence to such third party; (iv) that is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement; or (v) that is required to be disclosed in order to comply with applicable laws, regulations or orders (including, without limitation, state and federal securities laws applicable to either party as a public company) or administrative process or any governmental or court order; provided, however, that in a circumstance in which disclosure is compelled by governmental or court order, Provider shall limit the disclosure to only that information that must be disclosed to comply with the order and



**14.10 Security Breaches.** ██████████████████████

**14.11 Audits.** ████████████████████████████████

**15. MARKS AND INTELLECTUAL PROPERTY RIGHTS.**

**15.1 Marks.** ████████████████████████████████

**15.2 License in Company Marks.** ██████████████████████



**15.3** <u>Sublicense in DT Marks</u>. ████████████████████████████

**15.4** <u>Company and DT Rights; Termination</u>. ████████████████████

**15.5** <u>Other Rights</u>. ████████████████████████████████████

**15.6** <u>Protection of Company Rights</u>. ██████████████████████████



## 16. DISPUTE RESOLUTION.

### 16.1 Arbitration of Disputes.

16.1.1 Submission to Arbitration.

16.1.2

### 16.2 Discovery and Motions.

### 16.3 Limitation of Actions.

### 16.4 Initiation of Arbitration.

### 16.5 Decision and Enforcement of Award.



20. **SURVIVAL OF OBLIGATIONS.** ███████████████████
   ████ █████████████████████████████████████████████████
   ██████████████████████████████████

21. **ENTIRE AGREEMENT.** █████████████████████████████████
   ███████████████████████████ ██████████████████████████████
   █████████████████████████████████████████████████████████
   █████████████████████████████████████████████████████████
   ████████████████████████ ██ ███████████████████████████████
   █████████████████████████████████████████████████████████
   █████████████████████████████████████████████████████████
   ███████████████████ █████████████████████████████████████
   █████████████████████████████████████████████████████████
   █████████████████████████████████████████████████████████
   █████████████████████████████████████████████████████████
   ████████████████████████

EXECUTED as of the day and year first above written.


PROVIDER NAME:                **TCC Communications, Inc.**
OWNER/OFFICER (printed):      Shaher Ismail
SIGNATURE:
TITLE:                        *Ceo*


COMPANY:                      **T-MOBILE USA, INC.**


                              By: John Clelland

                              Its: **Vice President, Channel Development**


Reviewed and Approved as to Form:


T-Mobile USA, Inc. Legal Dept.


Retailer Services Agreement (Final 9.22.10)

Provider's Initials

34
CONFIDENTIAL & PROPRIETARY